FILED _____ ENTERED
LODGED _____ RECEIVED

JUN 22 2023   JC

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTERFER FRICK,<br><br>                    Plaintiff,<br><br>          v.<br><br>DR. DYE, *et al.*<br><br>                    Defendant. | No. CR21-110RAJ<br><br>PLAINTIF'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56<br><br>Noted: Friday, July 14, 2022<br><br>ORAL ARGUMENT REQUESTED |

## I. RELIEF REQUESTED

On December 14, 2022, Judge Richard A. Jones had the attorneys from the United States Attorney Office in court regarding whether Plaintiff Christerfer Frick was receiving adequate medical care at the Federal Detention Center, the place of employment of all of the defendants in order for him to stand trial in his criminal case.[1] Judge Jones stated:

> . . .And despite court intervention, where I had to require medical personnel. or lawyers from the Federal Detention Center coming to this court, or being available to this court, I still keep hearing about a projection into the future.
>
> This man need medical care and treatment now.
>
> We've had multiple hearings that have gone on for an extended period of time. The court has given the Federal Detention Center and counsel for the government numerous opportunities to come up with a specific and viable plan for care and

---

[1] *United States v. Christerfer Frick,* CR21-110RAJ

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 1

> treatment of the defendant. The defendant has repeatedly – and there's an abundance of record demonstrating that he's in either continued pain, and is in a foundering position to determine what condition he currently suffers from, with the absence of some type of specific medical diagnosis. There's been nothing, that I can see, that gets to the level of care or treatment needed for Mr. Frick.
>
> ... And I'm going to make the determination, that because of the absence of the proper care and treatment, and the complete absence of any specific care and treatment, dealing with Crohn's Disease issue, particularly with the fact that you have practitioners diagnosing him for increasing dosage of an anti-inflammatory, without a specific diagnosis, other than to deal with a part of the problem. Mr. Frick may be suffering from something that is far more complicated than anyone knows at the Federal Detention Center, and certainly beyond Mr. Frick's knowledge.

See Exhibit G, pp. 13 1.22 – 15, 1.7.

Here, Mr. Frick moves the Court for an order granting him summary judgment against all defendants on all of his claims pertaining to the lack of proper and adequate medical care on the basis that there are no genuine issues of material fact for trial and on the basis of collateral estoppel.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgement as a matter of law. See Fed. R. P. Civ. P. 56(a). The moving party bears the initial burden of establishing there is no genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp v. Catrett, 477, U.S. 317, 322 (1986).* To defeat the motion for summary judgement, the responding party must present admissible evidence sufficient to establish any of the elements that are essential to the moving party's case and for which that party will bear the burden of proof at trial. *See id.; Taylor v. List, 880, F.2d 1040, 1045 (9th Cir. 1989).* The Court may grant summary judgement if the motion and supporting materials, including the facts considered

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 2

undisputed, show the movant is entitled to summary judgement and if the responding party fails to properly address the moving party's assertion of facts as required by rule 56(c). *See* Fed. R. Civ. P. 56(e). The responding party cannot point to mere allegations or denials contained in the pleadings. It is not enough for the non-moving party to produce mere "Scintilla" of evidence. *Celotex Corp., at 252.* Instead, the responding party must set forth, by affidavit or other admissible evidence, specific facts demonstrating the existence of an actual issue for trial. *See KRL v. Moore, 384 F.3d 1105, 1110 (9th Cir. 2004)*

## III. FACTUAL AND PROCEDURAL BACKGROUND

On December 29, 2022, plaintiff filed a his Third Amended Complaint against Defendants James Parker, Dr. Maria Dy, Counselor Jeffrey Smith, Counselor Jason Bejhling, Christopher Fernandez, Israel Jacquez, Scotty Bussell, Giles Durano, Kevin Polsalski and T. Thomas. After preliminary proceedings including the defendants' Motion to Dismiss for Failure to Exhaust Administrative Remedies, the court denied their motion to dismiss. Dkt.s## 76; 77.

Plaintiff was incarcerated at the Federal Detention Center (FDC) from June 10, 2021, and was released by order of Judge Richard Jones in his criminal case on December 15, 2022. When he went into the FDC, he had a history of Crohn's Disease but it was managed and was seeing Dr. Jason Harper at Harborview Medical Center. Dr. Harper intended to find a new medication that would manage his symptoms long term. Mr. Frick also had some dental issues, including a cracked tooth, which was an anchor tooth for his partial denture. He had a dental plan in place for treatment of those issues. He had none of the medical conditions that

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 3

developed during his 18-month period of incarceration. He had none of the medical conditions that have been diagnosed since his release from custody in December 2022.

On June 10, 2021, when Mr. Frick arrived at the FDC while in the FDC sally port, while handcuffed, belly restraints and leg restraints, he was placed again with his back flush against a cement wall, a nurse walked up and shoved a Q-tip up his nose without warning Mr. Frick couldn't move his head back to avoid the Q-tip from being shoved to far up his nose. As a result, the Q-tip went so far up his nose that his nose bled and a day later, both of his eyes were black and blue. He was placed into quarantine where he stayed for 28 days.

According to the FDC medical records, Mr. Frick had an initial health screening on May 20, 2021, and May 21, 2021, Dr. Dy ordered a series of lab tests. Records state that Defendant Scottie Bussell administered a covid test on June 3, 2021. See Exhibit B to Frick Declaration. As shown in Exhibit C to Frick Declaration which is the docket sheet for his criminal case under cause number CR21-110RAJ, Mr. Frick was not arrested until June 10, 2021, so it was impossible for him to be seen on May 20, 21, and June 3, 2021. The medical report dated before his arrest and incarceration on June 10, 2021, are incorrect and unreliable and appear to be manufactured. Mr. Frick finds that many subsequent medical records are equally incorrect and unreliable. See Frick declaration p.2-4.

On June 15, 2021, the FDC noted that its medical staff received notice from Mr. Frick that he suffered from Crohn's Disease or chronic ulcerative colitis. But other than occasional cramping, he reported no symptoms. Although Mr. Frick recalled seeing the FDC dentist sometime in 2021, his cracked tooth began to hurt and he asked to see a dentist about it.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 4

On or about December 10, 2021, Mr. Frick was given a job working in the unit. At that time COVID19 was still running rampant in FDC SeaTac. As a person with Crohn's Disease, Mr. Frick has a compromised immune system and should have been isolated for his protection. Instead, he was told to work in a COVID 19 contaminated unit and put in direct contact with COVID positive inmates. As a result, he contracted COVID. This was also likely due to moving inmates who were positive out of cells and moving inmates who tested negative into cells where inmates who were positive had just left without any cleaning at all. Even after Mr. Frick tested positive, he was required to work. He continued to hand out food and clean and spread COVID to inmates. At one point over 70% of his unit tested positive for COVID. Mr. Frick was sick and felt very poorly but did not receive any medical care or even was seen by a medical person. See Frick Declaration.

Beginning in August or September 2021, Mr. Frick's symptoms of Crohn's Disease began to flare up. These symptoms started with diarrhea, bloody stools, and cramping. He began to send kites to the medical staff for an appointment but was ignored. See Frick Declaration p6 lines 10-15 and exhibit H of the Frick declaration. He became so sick that he used the bathroom numerous times a day, his abdomen got so swollen and sore that he couldn't sit in a chair with any degree of comfort. He became quite lightheaded and at one point fell in his cell and hit his head on the sink. Finally beginning in November 2021, the medical personnel gave prednisone to try to deal with these symptoms. Mr. Frick was very concerned about starting to take prednisone as he was well aware of the side effects of long-term use of the medication without being properly monitored. As stated by Judge Jones, it was prescribed without the benefit of diagnosis of his condition. See Exhibit G p.15 lines 1-7. As

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT --
Page 5

time went on and his symptoms did not improve, the FDC medical personnel simply increased the dosage of steroids as their only solution.

At the same time that his Crohn's Disease became such a problem, his cracked tooth also flared up. It was cracked and a nerve in the tooth was exposed. As a result, any air coming into his mouth made the pain extreme. He was unable to talk for more than a few minutes at times because of the pain as soon as the air came into his mouth. As documented in the sealed second motion for detention review and exhibit I. He had a very hard time eating the food supplied by the FDC which also aggravated his Crohn's symptoms. His countless requests for medical care fell on deaf ears see exhibit H of Frick Declaration. His attorneys in his criminal case were forced against Mr. Frick's objection to seek a continuance of his criminal trial because they felt that his physical condition was so poor that he could not receive a fair trial. See Ex. I to Frick Decl.

In his frustration, Mr. Frick began filing pro se motions to Judge Jones in his criminal case. The court held a hearing on October 31, 2022. There, the court had the FDC lawyer, George Cho, and Defendant Kevin Polsalski On the phone asking them about the state of Mr. Frick's medical situation. See Exhibit Q – transcript of October 31, 2022 hearing in CR21-110RAJ. Even then defendants could not provide the court with specific information about his care and treatment. This was not surprising since there was none. However, they promised the court they would do something.

On November 3, 2022, Mr. Frick was sent to an oral surgeon to have his tooth extracted. When his blood pressure was taken, it was 176/130, 136/107, 159/125, 130/90, 186/32 at discharge. See exhibit M of Frick Declaration. On his return to the FDC, Mr. Frick

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 6

told Defendant Polsalski about his high blood pressure readings but he did nothing to address the issue. He didn't take his blood pressure again that day or any other day. Polsalski also substituted the prescribed pain medication from the outside provider with Ibuprofen which a person with Crohn's cannot take and could have caused serious harm to Mr. Frick had he taken it. Polsalski reported to the court that there was no reason to assume that Mr. Frick suffered from high blood pressure and referenced records from 2012. See exhibit Q, However, after Mr. Frick was released, medical records show that he does in fact suffer from high blood pressure and Mr. Frick is currently on medication for this ailment (see the 9 sealed status reports submitted under seal in the Frick declaration) that document Mr. Frick's serious medical issues one of which was high blood pressure) Mr. Frick had a heart attack the day after his release from the FDC. The heart attack was caused by acute steroid withdrawal and high blood pressure. The FDC negligently did not supply any release medication specifically prednisone until he could get a prescription from a doctor in the community. This is not a common practice when inmates are released from custody while taking medication. (see exhibit O of Frick declaration) Mr. Frick abruptly stopped taking prednisone which attributed to the heart attack as reported in the 9 sealed status reports documenting Mr. Frick's medical issues connected to Frick declaration. In which he was diagnosed as having a heart attack due to acute steroid withdrawal and extremely high blood pressure.

Since his release from the FDC and direct cause of the neglect of medical care, Mr. Frick has been diagnosed with a significant heart condition, he had a mini stroke (TIA) resulting in partial paralysis of his left side. His criminal trial again had to be continued from June 20, 2023, to November 6, 2023, in order to give him time to recover use of his left side.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 7

He is still unable to walk very far and not without a cane. He has a pulmonary condition that cannot be explored because of his heart condition and the need to be released from his cardiologist to follow up on it. All of these new conditions came about because of the lack of care at the FDC at the hands of the defendants here. See medical reports attached to the 9 status reports submitted under seal. These medical reports document the medical care Mr. Frick needed versus the medical care he received at FDC SeaTac.

### III. ARGUMENT AND AUTHORITY

### A. MR. FRICK HAD SERIOUS MEDICAL NEEDS REQUIRING MEDICAL ATTENTION OF WHICH THE DEFENDANTS KNEW AND DID NOTHING.

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity of a doctor's attention." However, the Fifth and Eighth Amendment prohibits the "unnecessary and wanton infliction of pain," *Estelle v. Gamble 429 U.S. 97, 104, 97, S.Ct. 285 (1976)*, and many decisions especially recent ones have emphasized pain in determining in what needs are serious. *See Hayes v Snyder, 546 F.3d 516, 523 (7th Cir 2008); McGuckin v. Smith 974 F.2d 1050, 1060 (9th Cir 1992., Farrow v. West, 320 F.3d 1235, 1244-45(11th Cir 2003).* Recent decisions have also emphasized whether a medical condition disables the plaintiff or interferes with daily activities *Lavender v. Lampert 242 F.Supp 2d 821, 845 (2002); McGuckin v. Smith 974 F.2d 1050, 1060 (9th Cir.1992).* Complaints in which courts have have found serious include severe chest pain, HIV, hepatitis, tuberculosis, dental pain and loss of teeth, asthma, diabetes and its complications, and Crohn's Disease *see Woulard v. Food Service, 294 F.Supp. 2d 596,604 (2003).*

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 8

Since pretrial detainees cannot obtain their own medical services, the Constitution requires prison authorities to provide them with "reasonably adequate" medical care. Courts have defined "adequate" medical services as "services at a level reasonably commensurate with modern medical science and of quality acceptable within prudent professional standards", and as "a level of health services reasonably designed to meet routine and emergency medical, dental, and psychological or psychiatric care. *See Fernandez v. U.S. 941 F.2d 1488, 1493 (11th cir 1991); accord, U.S. v. DeCologero, 821 F.2d 39, 43 (1st Cir 1987); Barrett v. Coplan, 292 F.Supp. 2d 281, 285 (D.N.H. 2003)* ("Adequate medical care' requires treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standards in considerations."…(citing *DeCologero*).

There does not need to be a showing that defendants knew exactly what was wrong with plaintiff or what its consequences could be if it was clear plaintiff had a serious problem and the defendants disregarded it. *Alsina-Ortiz v. LaBoy, 400 F.3d 77, 83 (1st Cir 2005)* (holding guards knew of prisoners "prolonged, manifest, and agonizing pain" and did nothing to get care for him could be found deliberate indifferent. *Hollenbaugh v. Maurer, 397 F.Supp.2d 894, 904 (N.D.Ohio2005)*(" the plaintiff does not have to show that defendants knew of the exact medical risks threatening Hollenbough"; the fact that he did not self-diagnose his heart attack or report his heart condition did not absolve defendants who observed ample evidence of his symptoms and complaints.

Prison officials must provide a medical staff that is "competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or to refer prisoners to others who can". *Medcalf v. State of Kansas, 692 F.Supp. 1179, 1186 (D.Kan. 1986)* (supervisor had

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 9

a duty " to carefully hire, train and supervise adequate medical personnel capable of evaluating and meeting reasonable medical needs"). The rendering of medical services by unqualified personnel is deliberate indifference, as is the failure to provide access to specialist care that plaintiff's condition required. Prison officials must provide enough medical staff to meet the needs of the population. If plaintiff required care that was not available in the prison, the failure to obtain it elsewhere constitutes deliberate indifference. *See Carty v. Farrelly, 957 F.Supp 727, 737 (D.V.I 1997)* ("failure to refer prisoners requiring medical care from outside specialists to such providers also constitutes deliberate indifference"). FDC SeaTac medical providers knew that Mr. Frick suffered from serious medical needs such as abdominal pain and discomfort, internal bleeding, vomiting and other unevaluated serious medical conditions, and Crohn's disease flares. They also knew that Mr. Frick's condition required specialized care and treatment and did not provide such care. Mr. Frick's outside provider attempted to contact FDC SeaTac in August 2021 to discuss Dr. Harpers treatment plan and care for Mr. Frick Crohn's disease (see exhibit P of Frick declaration) the FDC did not reply to Dr. Harpers office. The one instance that the FDC did send Mr. Frick to an outside provider they failed to send any medical records to the visit so the colonoscopy could not be performed, ( see page 3 of attachment A of the first status report docket # 110 filed under seal in Frick declaration) however Mr. Frick was sent back to the FDC with specific instructions that were not followed by FDC. see Frick declaration P.4 line 1-9. The fact that FDC SeaTac had practitioners diagnosing him for increasing dosage of steroids and other medications without a specific diagnosis as what else Mr. Frick may be suffering from when in fact Mr. Frick was suffering from medical issues that were far more complicated than anyone knew. The FDC

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT --
Page 10

did nothing to detect or prevent the pain that Mr. Frick suffered the 18 months at FDC SeaTac.

The keeping of medical records is a necessity, adequate and accurate records are of critical importance in any attempt to provide continuity of medical care, and absent or deficient records create the possibility for disaster. *See Morales Feliciano v. Calderon Sierra, 300 F.Supp. 2d. 321, 341 (D.P.R. 2004); Coleman v. Wilson, 912 F.Supp. 1282, 1314 (E.D.Cal. 1995)* ( a necessary component of minimally adequate medical care is maintenance of complete and "accurate" medical records.") Courts have condemned the failure to maintain a reasonably complete and organized system of medical records., or the purposeful destruction of or tampering with medical records, *Miranda v. Munoz, 770 F.2d 255,261 (1st Cir 1985)* (prison officials' knowledge of continuing problem of prisoners arriving at hospital without their medical records cited a basis for damage liability). *Brown v Coughlin, 785 F.Supp 876, 882 (S.D.N.Y. 1991)* (failure to transfer necessary medical records in a timely fashion , supported a deliberate indifference claim). A jury would find that treatment of plaintiff consisted of little more than documenting plaintiff's worsening condition and continuing ineffective treatment, not withstanding frequent examinations and referral to specialist.

Here, the FDC has failed to keep adequate medical records as seen in the series of records dated before Mr. Frick was arrested and detained at the FDC. Once it is conclusively determined that medical records have been falsified or kept in a negligent manner so as to be unreliable, it is impossible to determine which record or when records were kept and maintained appropriately. There are countless examples where Mr. Frick disagrees with the

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 11

written documentation of the FDC as to his medical complaints, the kind of examination or lack of examination described, and the prescription of medication, particularly prednisone. Another instance is the FDC warden Jacquez reporting in an administrative response to Mr Frick that a colonoscopy had been performed on August 30, 2022, when in fact it had not. (see Frick declaration P.3 line 15-9 of P.4, also see exhibit E).

## B. MR. FRICK HAD SERIOUS DENTAL NEEDS OF WHICH THE DEFENDANTS KNEW AND DID NOTHING.

Deliberate indifference to serious dental needs is unconstitutional. The presence of a serious dental need may be "based on various factors, such as the pain suffered by the plaintiff…the deterioration of the teeth due to a lack of treatment…or the ability to engage in normal activities". Thus, the restoration or extraction of painful decayed teeth, and the making of dentures for patients who need them to eat properly, are serious needs. The failure to provide reasonable, and reasonably prompt, attention for these conditions, and the failure to provide follow-up care violates the constitution. See *Hunt v. Dental Dept 865, F.2d 198 (9th Cir 1988)* also see *Peralta v. Dillard 744, F.3d 1076 (9th Cir 2014) See Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001)* ( Dental care is "one of the most important medical needs of inmates. *Moore v Jackson, 123 F.3d 1082,1087 n.3 (8th Cir 1997)* (holding 3-month delay in treating a toothache in the face of the prisoner's repeated complaints supported deliberate indifference claim; complaints supported an inference of actual knowledge by the dentist. *Fields v. Gander, 734 F.2d 1313, 1315 (8th Cir. 1984)* (three-week delay in treatment of a painful condition stated a claim); *Carver v. Knox County, Tenn.,753 F.Supp. 1370, 1391 (E.D.LTenn. 1989)* ( "substantial delay" in "necessary dental treatment" violates the Constitution) *remanded for reconsideration, 887 F.2d 1287 (6TH Cir1989) Dean v. Coughlin,*

*623 F.Supp. at 404 (* dental conditions are serious if they cause pain, discomfort or threat to good health).*Goodnow v. Palm, 264 F.Supp.2d 125, 132-33 (D.Vt.2003)(* painful broken tooth was a serious need.

Mr. Frick suffered an extended delay in receiving any type of dental care for his cracked tooth with exposed nerve despite numerous medical requests pleading with medical staff to do something (see exhibit H of Frick declaration). When Mr. Frick received no response from medical/dental his attorney started filing detention review motions (See exhibit I of Frick declaration). It was not until the October 31st hearing (See exhibit Q transcripts of the hearing held on October 31st), that Judge Jones had heard enough excuses and ordered the FDC to do something to treat Mr. Frick's tooth pain, it was only then that the FDC sent Mr. Frick to an outside provider to receive the needed dental care.

## C. THE DEFENDANTS' DELAY AND DENIAL OF ACCESS TO TREATMENT WAS A VIOLATION OF MR. FRICK'S CIVIL RIGHTS.

Denial of access to treatment may include interference with access to medical personnel or to a hospital, or failure of medical personnel to deal with plaintiff's problem or to do so timely. How much delay in treatment is tolerated depends on the seriousness of the medical need. Some Courts have held that delay is only actionable when it results in "substantial harm", but that standard is met if pain and suffering are unnecessarily prolonged. Plaintiff was denied access to medical personnel with the necessary specialized expertise to treat his condition. They also failed to conduct tests that plaintiff's condition and symptoms called for. SEE exhibit G of Frick declaration. Interference with medical judgement by factors unrelated to prisoners' medical needs. See p.4 lines 1-8 of Frick declaration. These factors include staffing so inadequate that medical staff lack the time to do their jobs. [S]ystemic

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 13

deficiencies in staffing, facilities, or procedures which make unnecessary suffering inevitable constitutes deliberate indifference, *Todaro v. Ward, 565, F.2d 48, 52 (2nd Cir 1977) ( quoting Bishop v. Stoneman, 508 F.2d 1224, 1226 (2nd Cir 1974)*. Sheer disorganization and dysfunction in a medical program can amount to deliberate indifference if it prevents prisoners from receiving necessary care. see *DeGidio v. Pung, 920 F.2d 525, 529 (8th Cir 1989)*.

### D.  THE DEFENDANTS' FAILURE TO PROVIDE PROPER MEDICAL CARE AMOUNT TO DELIBERATE INDIFFERENCE.

High level officials can be found deliberately indifferent if they "knew of a continuing pattern of culpable failures by guards or other prison staff to refer to health providers those prisoners with culpable complaints or manifest symptoms. *Gibson v County of Washoe, Nev., 290 F.3d 1175, 1190-91 (9th Cir 2002)* (holding that county policy makers could be held liable for policy that delayed psychiatric treatment for some new urgent health problems requiring hospitalization" and were "keenly aware" that mental illnesses could present urgent needs. *Bass v. Wallenstein, 769 F.2d 1173, 1184-86 (7th Cir 1985)* (Holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in medical care system). see exhibit E and p.3 lines 15-9 of Frick declaration

The level of medical care constitutionally required in state prisons was stated in *Hoplowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir.1982). In Hoptowit, the court stated that 1) prisoners must be allowed to request medical care; 2) prisoners must have access to competent medical personnel; 3) prisoners must have adequate emergency care. See also *Johnson v. Alameda County Sheriff's Dept.*, 892 F.2d 83 (9th Cir. 1989) (distinguishing between disagreeing with the type of medical care provided versus no medical care at all).

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 14

The indifference to medical needs must be substantial; a constitutional violation is not established by negligence or "an inadvertent failure to provide adequate medical care." Estelle, 429 U.S. at 105-06; see Anthony v. Dowdle, 853 F.2d 741, 743 (9th Cir.1988). Similarly, a difference in opinion as to diagnosis or treatment does not establish a constitutional violation. Shields v. Kunkle, 442 F.2d 409, 410 (9th Cir.1971).

Systemic deficiencies in staffing, facilities, or procedures [which] make unnecessary suffering inevitable supports a finding of deliberate indifference. When high level official enact policies such as the Covid-19 action plan they are responsible for staff misconduct such as denying plaintiff the right to refuse treatment (Covid testing) *See attached BOP guidance for managing inmate refusal testing for Covid -19,* program statement 6190.04, infectious Disease management, states, "The Bureau tests an inmate for an infectious or communicable disease when the test is necessary to verify transmission following exposure to bloodborne pathogens or to infectious body fluid. An inmate who refuses diagnostic testing is subject to an incident report for refusing to obey an order". If an inmate refuses testing, the first action is to educate the inmate on the importance of testing, why it is being conducted and the potential risks and benefits of testing vs refusal.

A distinction should be made between those who simply refuse testing from those who are willing to be tested but are unable to tolerate the preferred nasopharyngeal swab. If an inmate refuses the direct order, an incident report should be generated. A medical refusal report should also be completed. Due to the risk of exposure for staff, the use of force to involuntarily obtain a sample is generally not recommended. Inmates should be isolated until they consent to testing to avoid exposure to other individuals. Inmates at FDC are not given

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 15

the ability to refuse treatment they are told that it is mandatory and immediately upon arrival to FDC SeaTac in the sallyport while in belly and hand restraints back against a cement wall no way to move your head to avoid the Q-tip being inserted to far, the nurse goes down the line testing without warning, shoving the Q-tip so far up plaintiff's nose that it caused his nose to bleed resulting in both eyes becoming black a few hours later. Plaintiff was not the only inmate to report this, other inmates have reported the same thing during initial intake testing.

A mentally competent adult has a right under both the common law and the Fourteenth Amendment to refuse medical treatment *See Cruzan by Cruzan v. Director, Mo.Dept of health , 497 U.S. 261, 277-78 110 S.Ct. 2841 (1990).* Medical treatment to which the patient has not consented to may constitute assault and/or battery. The common law right to refuse treatment or testing is part of the "informed Consent" when an inmate is not informed of why the test is being performed, how is he informed and able to make a decision. A right to such information is reasonably necessary to make an informed decision to accept or reject proposed testing or treatment as well as a reasonable explanation of the consequences of refusal and an explanation of a viable alternative testing that can be made in a prison setting. A mandatory TB tests falls under the same guidance as Covid-19 testing and is done once a year in all institutions and an inmate can refuse the TB tests and the consequence is the inmate receives a incident report and is placed in the special housing unit SHU until he or she complies with the testing. The inmate is not and cannot be forced to take the TB test.

**E. THE DEFENDANTS' GROSSLY INADEQUATE MEANS OF COMMUNICATION OF MEDICAL NEEDS VIA SICK-CALL CONSTITUTED VIOLATION OF MR. FRICK'S CIVIL RIGHTS.**

Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff. *See Lewis v. Wallenstein, 769 F.2d 1173, 1184-85 (7th Cir. 1985)* (known deficiencies in sick call system supported a finding of deliberate indifference) (See page 6  lines 10-16 and exhibit H of Frick Declaration). Prisoners in an isolated confinement such as Covid quarantine must be able to communicate their medical needs to staff. *See Todaro v. Ward, 565 F.2d 48, 51-52 (2nd Cir 1977)* (infirmary patients in isolation rooms must be provided with a way to summon nurses). Sick call must be conducted in a fashion that permits prisoners' complaints to be evaluated in a professional manner. *Hoptowit v. Ray, 682 F.2d at 1252-53* (evaluation of medical care complaints via written "kites" rather than examination of the patient was inadequate).. See exhibit D and page 3 lines 4-9 on page 4 of the Frick declaration, where Corliss reported in the medical records that he performed a medical exam on Mr. Frick and during this exam he reported issues that could not of been detected without a hands on exam however Corliss never put his hands on Mr. Frick he examined Mr. Frick through his cell door which is a solid steel door in the housing unit during a Covid-19 lockdown. This is not a accurate records of a proper exam as reported . *U.S. v. State of Michigan, 680 F.Supp. 928, 1043-45, 1061 (W.D.Mich. 1987)* (Decisions about medical priorities cannot be made from the inmates written complaint without an examination; court later excepts a written complaint system that requires all prisoners with non-routine complaints to be seen by a doctor within 24 hours). Sick call inquiries and examinations that were not "thorough" and in which plaintiff was never touched only examined through a cell door does not constitute a proper medical examination. *See Tillery v Owens 719, F.Supp at 1306, 1308*

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 17

**F. THE DEFEDNATS' VIOLATED BUREAU OF PRISONS' POLICIES PERTAINING TO COVID 19 PREVENTION THAT VIOLATED MR. FRICK'S CIVIL RIGHTS.**

Prison officials have an obligation to protect prisoners from risk of infectious disease *Jolly v. Coughlin, 76, F.3d 468, 477 (2nd Cir 1996); see Helling v. McKinney, 509, U.S. 25, 33, 113 S.Ct 2475 (1993) (*citing cases condemning the failure to separate prisoners with contagious disease from others). It violates the Fifth and Eighth Amendment to expose prisoners to sources of infection such as Covid-19. Both active and latent Covid-19 are a serious medical need. Prison officials should be found deliberate indifferent in failing to correctly respond to covid-19 exposure and outbreaks of the disease by failing to protect prisoners from infection and spread. FDC SeaTac officials failed to protect inmates from the spread of covid-19. SeaTac officials arranged moves that allowed the spread of the covid 19 virus within the institution. Specifically, when unit DB went into quarantine due some inmates testing positive, prison official decided to make the top tier in DB unit isolation and quarantine. In doing this FDC Officials moved the positive inmates to the upper tier and moved the upper tier negative inmates to the bottom tier, for example if one inmate in cell 29 on the lower tier tested positive for covid 19 that inmate would be moved to a cell on the upper tier and because they needed cells that were occupied on the upper tier they moved inmates from the upper tier to the lower tier and on several occasions they would place the inmate from the upper tier ( who tested negative )into cells that had just minutes prior housed a positive covid-19 inmate. If one inmate tested positive and his celli did not they would move the positive inmate to the top tier and move another person who tested negative in to the same cell with the celli of the person who tested positive even though the celli was just exposed.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 18

The CDC recommended that when a person is exposed he should be quarantined per guidelines meaning if one person in a cell tests positive and one does not they should both be quarantined together in the same cell to prevent the spread and not separated into one foes this way and one goes that way this procedures the FDC used allowed for the spread of the virus to inmates that would of never been exposed had they not been moved. The incident that personally happened to plaintiff was he was on the upper tier cell 34 and they moved him to cell 29 on the lower tier, directly into a cell that had minutes prior housed two Covid-19 positive inmates putting plaintiff in direct exposure to covid-19. In addition, the way moves were orchestrated by the FDC Officials allowed for the spread and continued extended lockdowns. For example, when moving a negative inmate into the same cell as a negative inmate that was just exposed to covid 19, allowed the virus to continue to spread and allowed the FDC officials to use extended lockdowns as a means of covid -19 prevention instead of following CDC protocols. FDC officials would orchestrate a unit wide test testing everyone in the unit. Then based on the test results they would orchestrate moves as mentioned above however moving inmates that tested negative into cells that just housed positive inmates allowed for the incubation and the continued spread of the Covid-19 throughout the unit. Then when testing 7-14 days later inmates that were moved into these cells tested positive and quarantine isolation time started over for the whole unit allowing for extended lockdowns. The same incident were argued in *Fraihat v. U.S. Immigration 16 F.4th 613 (9th Cir 2021)* (Holding that medical isolation and quarantine are distinct from solitary, segregated, or punitive housing, that extended lockdowns as a means of Covid-19 prevention are not allowed, and that access to diversion (books, television, recreation) and to telephone must be

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 19

maintained to the fullest extent possible. None of which were followed by FDC officials. FDC officials acted with "medical indifference" in violation of the Fifth Amendment "by failing to promulgate minimally adequate system wide requirements in response to the pandemic. Secondly FDC officials created "punitive conditions of confinement" in violation of the Fifth Amendment and in violation of section *504 of the Rehabilitation Act 29 U.S.C  794.( 445 F.Supp 3d at 741-48). See All for the Wild Rockies, 632 F.3d at 1135.* because the conditions at FDC SeaTac was worse than those in the federal system and FDC SeaTac was under constant scrutiny in regards to its procedures to control or stop the spread of covid 19 . In demonstrating deliberate indifference plaintiff only needs to show that:

(i)     The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined.

(ii)    Those conditions put the plaintiff at substantial risk of suffering serious harm.

(iii)   The defendants did not take reasonable available measures to abate the risk, even though a reasonable official in the circumstances would have appreciated the degree of risk involved-making the consequences of the defendant's conduct obvious.

(iv)    By not taking such measures caused plaintiff injury or harm.

*Gordon v. County of Orange 888 F.3d 1118, 1125 (9th Cir 2018*

| UNDISPUTED FACTS | SOURCE |
| --- | --- |

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 20

| | |
|---|---|
| Dr. Dy (medical staff) did prescribe plaintiff prednisone for his Crohn's Disease. Then failed to monitor the adverse effects of the prednisone use. | **See Frick declaration** |
| Dr. Dy (medical staff) failed to schedule any follow up appointments or lab work to evaluate plaintiff's conditions and other health concerns created from the use of prednisone and lack of medical care, despite numerous electronic sick call requests sent by plaintiff. | See Frick Declaration |
| J. Parker (FDC Dental department) knew about and refused treatment to plaintiff for a cracked tooth and exposed nerve for over 13 months. | See Frick declaration also see motion to review second detention order Exhibit I of Frick Declaration. |
| J. Parker (FDC Dental department) had to be court ordered to treat plaintiff's tooth pain. | See court transcripts exhibit Q of Frick declaration |
| Counselor Smith and counselor Behling did knowingly and intentionally move plaintiff to a cell that had minutes prior housed two covid 19 positive inmates. Disregarding plaintiff's health and safety and directly exposing plaintiff to Covid-19. | See Frick declaration. |
| Unit team supervisor Fernandez did knowingly and intentionally authorize the unit cell moves orchestrated by counselor Smith and Behling | See Frick Declaration. |
| Warden Jacquez implemented the covid 19 action plan which allowed medical to forcefully administer covid 19 tests to inmates upon intake. These tests are administered while inmates are shackled in belly restraints and hand restraints. The Q-tip was forced so far up plaintiff's nose it caused his nose to bleed and blackened plaintiff's eyes. | Plaintiff has the right to refuse the covid-19 tests. See attached BOP modified operations (exhibit ???). Also see the BOP guidance for managing inmates refusing testing for Covid-19. (exhibit A of Frick Declaration) |
| Scottie Bussell failed to monitor, reply or review requests for medical attention directed to him and his department by plaintiff. | See exhibit H and page 6 lines 9-22 of Frick declaration |
| Giles Durano failed to follow up or schedule outside specialized medical care for plaintiff. Durano also failed to schedule the outside dental appointment plaintiff needed for 18 months. | See Frick Declaration and exhibit G also see second motion for detention review filed under seal attached to Frick declaration. |
| Kevin Polsalski and T. Thomas failed to treat plaintiff's Crohn's disease and failure to monitor Plaintiffs' lab results documenting high blood pressure. | See attached exhibit G also see attached 9 status reports filed under seal. |
| Polsalski and Thomas also failed to supply release medication to plaintiff upon his court ordered release to seek proper medical care. Resulting in acute steroid | See updated covid-19 action plan Exhibit O. To assist inmates who are releasing from custody and |

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 21

| | |
|---|---|
| withdrawal causing plaintiff to have a mild heart attack among other steroid withdrawal symptoms. | facing difficulty obtaining medication, the BOP is to provide such inmates with a sixty-day supply of medications also see 9 status reports documenting medical received since release from FDC Seatac. |
| Polsalski also prescribed Ibuprofen to plaintiff which could have caused serious risks to plaintiffs' health. | See Frick declaration |
| | |
| | |
| | |
| | |
| | |
| | |

## V. CONCLUSION

For the reasons and evidence presented herein, Plaintiff Christerfer Frick is entitled to summary judgment as a matter of law on his claims of violation of his civil rights by the treatment of the defendants during the time of his incarceration at the Federal Detention Center.

DATED this 21st day of June, 2023.

CHRISTERFER FRICK, PRO SE
27340 Village Place NW
Stanwood, WA 98292
206-373-5615

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT –
Page 22